## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **CRIMINAL NO. 22-CR-0009** |
| | : | |
| **v.** | : | |
| | : | **SENTENCING:  June 28, 2022** |
| **CHARLES WUNDERLICH,** | : | |
| **Defendant.** | : | |

### GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING
### (Redacted)

The United States, by and through its attorneys, the United States Attorneys for the District of Columbia, hereby submits the following memorandum to assist the Court in issuing an appropriate sentence in this case.  For the reasons set forth herein, the government recommends that the Court sentence the defendant 120 months (10 years) incarceration.  The government further recommends that the Court sentence the defendant to 15 years of supervised release with conditions that include that the defendant undergo sex offender treatment, continued drug and mental health treatment, the defendant's computer and internet usage be limited and monitored, and the defendant's direct contact with minors be limited and supervised.

## I.      BACKGROUND

On March 31, 2022, the defendant pled guilty to one count of Conspiracy to Distribute Child Pornography, in violation of 18 U.S.C. §§ 2252(a)(2) and (b)(1).  During the plea hearing, the defendant admitted to the following facts, as set forth in the written Statement of Offense, to be true.

The Tor Network

Tor is a computer network which anonymizes Internet activity by routing a user's communications through a global network of relay computers (or proxies), thus effectively masking the internet-protocol ("IP") address of the user.  An "IP address" is a unique numeric address (used by computers on the internet) that is assigned to properly direct internet traffic. A

publically visible IP address can allow for the identification of the user and his/her location.

To access the Tor network, a user has to install freely available Tor software, which relays only the IP address of the last relay computer (the "exit node"), as opposed to the user's actual IP address. There is no practical method to trace a user's actual IP address back through those Tor relay computers.

The Tor network makes it possible for a user to operate a special type of website, called "hidden services," which uses a web address that is comprised of a series of 16 algorithm-generated characters (such as "asdlk8fs9dflku7f") followed by the suffix ".onion." Websites, including hidden services, have system administrator(s) (also called the "admin(s)") who are responsible for overseeing and operating these websites.

Bitcoin

Bitcoin ("BTC") is one type of virtual currency that is circulated over the Internet. BTC is not issued by any government, bank, or company but rather is controlled through computer software. Generally, BTC is sent and received using a BTC "address," which is like a bank account number and is represented by a case-sensitive string of numbers and letters. Each BTC address is controlled through the use of a unique private key, a cryptographic equivalent of a password. Users can operate multiple BTC addresses at any given time, with the possibility of using a unique BTC address for every transaction.

BTC fluctuates in value. Around March 5, 2018, one BTC was worth approximately $11,573.00. A typical user purchases BTC from a BTC virtual-currency exchange, which is a business that allows customers to trade virtual currencies for conventional money (*e.g.*, U.S. dollars, euros, etc.). Little to no personally identifiable information about the sender or recipient is transmitted in a BTC transaction itself. However, virtual currency exchanges are required by U.S. law to collect identifying information of their customers and verify their clients' identities.

To send BTC to another address, the sender transmits a transaction announcement, cryptographically signed with the sender's private key, across the BTC network. Once the sender's transaction announcement is verified, the transaction is added to the blockchain.  The blockchain is a decentralized, public ledger that logs every BTC transaction.  In some instances, blockchain analysis can reveal whether multiple BTC addresses are controlled by the same individual or entity. For example, analyzing the data underlying BTC transactions allowed for the creation of large databases that grouped BTC transactions into "clusters." This analysis allowed for the identification of BTC addresses that were involved in transacting with the same addresses.

## THE WEBSITE

Welcome To Video ("The Website") was a website dedicated to the advertisement and distribution of child pornography that operated as a hidden service on the Tor network until March of 2018 when it was seized by law enforcement.  The Website was used to host and distribute video files depicting child pornography that could be downloaded by site users.  The Website was not intended to be used to upload pornography of adults, as evidenced on the upload page on The Website which clearly stated: "Do not upload adult porn."  The Website server had over 250,000 unique video files, which totaled approximately eight terabytes of data.

Any user could create a free account on The Website by creating a username and password. Only after the user registered an account could the user browse previews of videos available for download and post text to The Website.  To download videos from the site, users used "points," which were allocated to users by The Website.  A registered user could earn points from The Website in several ways: (1) uploading videos depicting child pornography; (2) referring new users to The Website; (3) paying for a "VIP" account, which lasted for six months, entitled a user to unlimited downloads, and was priced at 0.03 BTC (approximately $327.60 as of March 1, 2018); or (4) paying for points incrementally (*i.e.*, .02 BTC for 230 points).  Points were not transferable

to any other website or application. Once a customer sent BTC to The Website, the BTC could not be refunded or redirected. The points obtained by the payment of BTC could only be used for downloading videos.

Certain persons joined the conspiracy to distribute child pornography by uploading videos to The Website. Those co-conspirators who uploaded videos of child pornography to The Website for "points" also earned additional "points" each time a customer of the site downloaded that particular video from The Website. Thus, the co-conspirators had a shared goal as part of the conspiracy – increasing the number of unique videos on The Website to drive additional traffic to it, which in turn led to greater downloads and more points for the co-conspirators. When uploading videos, the co-conspirators would use explicit file names highlighting the content as showing the sexual exploitation of minors and would add tags that customers could search for, such as PTHC, 2yo, etc. In order to prevent duplicate videos from being uploaded, The Website operated a digital hash-value check of videos the co-conspirators uploaded in order to compare the video to other videos previously uploaded to the site. The Website did not allow a co-conspirator to upload a video whose hash value matched something previously uploaded to the site.

During the course of the investigation, law enforcement agents in Washington, D.C. accessed The Website on multiple occasions, including on or about September 28, 2017, February 8, 2018, and February 22, 2018, observed its functionality by browsing the listings on The Website, and conducted undercover purchases by downloading child pornography video files from The Website. These downloaded child pornography video files included pre-pubescent children, infants, and toddlers engaged in sexually explicit conduct. Each video available for download from The Website had a title, a description (if added by the co-conspirator), "tags" with further descriptions of the video enabling a user to more easily locate a particular category of video using The Website's search function, and a preview thumbnail image that contained approximately

sixteen unique still images from the video.

On or about March 5, 2018, South Korean law enforcement executed a search warrant at the residence of the administrator of The Website in South Korea.  Pursuant to the search, South Korean law enforcement seized The Website's server and associated electronic storage media. South Korean law enforcement then provided to U.S. law enforcement a forensic image of the server.  U.S. law enforcement subsequently obtained a federal search warrant to review this forensic image.

### IDENTIFICATION OF CO-CONSPIRATOR WUNDERLICH (A/K/A THUERINGER92262)

As part of the investigation, law enforcement reviewed the forensic image of The Website server to obtain leads on the co-conspirators participating in the scheme involving The Website. After law enforcement identified a unique BTC address that sent BTC to the site, law enforcement would obtain records from the virtual-currency exchanges that transacted with those addresses to identify who the person was behind the transaction.  Law enforcement has arrested many of the subsequently identified co-conspirators.

A review of the forensic image of The Website server revealed that the defendant made four transfers of BTC, totaling approximately 0.0948203 BTC (worth about $72.22 at the time of transaction) from a virtual-currency exchange in the United States ("BTC Exchange 1") to The Website's BTC address starting in 1Lha on the following dates:

- February 4, 2017 – 0.0408 BTC ($40.49)

- October 9, 2016 – 0.0138 BTC ($7.99)

- October 9, 2016 – 0.03430814 BTC ($20.62)

- October 3, 2016 – 0.00591216 BTC ($3.12)

Records from the BTC Exchange 1 revealed that the source of these BTC transfers were

from the defendant's account with the username "chuck2565666" ("Subject BTC Account 1").

A review of the defendant's activities on The Website under the username "thueringer92262" revealed that between approximately August 16, 2017 and November 9, 2017, the defendant downloaded approximately four videos from The Website with video file names and descriptions indicative of child pornography. Additionally, from approximately July 24, 2016 to October 5, 2016, the defendant uploaded approximately 13 videos to The Website with video file names and descriptions indicative of child pornography.

Law enforcement viewed the videos that the defendant uploaded to The Website. One of the videos uploaded by co-conspirator thueringer92262 was entitled "(Pthc Kidcam Lolifuck) 11Yo Girl Moaning Having Orgasm.avi." The video had a description tag entitled "dammiytboys and girls." The video, which is approximately 2 minutes and 18 seconds long, depicts a nude prepubescent female child, approximately 10-11 years old, sitting on a chair facing the camera with her legs apart. During the video, the child uses her right hand to masturbate her genitalia while looking at the camera. After one minute into the video, the child moves toward the camera and appears to be using a keyboard, indicating she is using a computer. The child repositions the angle of the camera downward to focus on her genitalia as she continues to masturbate her genitalia using her fingers. At the end of the video, the child stands up, turns around with her buttocks exposed to the camera, and uses her hands to spread her buttocks to expose her genitalia. This video was downloaded approximately 18 times by other users of The Website.

Another video that the defendant uploaded to The Website was entitled "Pthc - 9Yo Linda Takes Dad Up Ass And Sucks His Cum And Swallows.mpg." The video had a description tag entitled "boys and gorls." The video, which is approximately 33 minutes and 52 seconds long, depicts a nude prepubescent child, approximately 10-12 years old, performing fellatio on

6

the penis of a nude adult male. Approximately seven minutes into the video, the scene changes to depict the child laying on her back with the focus of the camera on her genitalia while the child masturbates her genitalia with her fingers and a white vibrator. The child also inserts her fingers and the vibrator into her vagina and anus. Approximately twenty minutes into the video, the adult male inserts his penis into her anus while the child continues to masturbate her genitalia with her fingers. The adult male continues to engage in anal sex with the child until the end of the video. This video was downloaded approximately 10 times by other users of The Website.

Law enforcement also reviewed the defendant's downloads from The Website and confirmed that the videos depicted child pornography.  For example, a video with hash tag "55fbc366e0beb63e08ffc35e56e44242" and entitled "Zz99 - ((((Boylove)))) Datrufeelin 5Yo Thai Boy Gets Fucked In The Ass And Then Fucked Again Super Doggy Style By Man.avi, which is approximately 23 minutes and 52 seconds long, depicts a nude prepubescent boy and a nude adult on a brown and tan colored couch. When the video opens, the boy is seen masturbating the male's erect penis. During the video, the adult male spreads the boy's legs apart, repeatedly inserts his finger into the boy's anus, and penetrates the boy's anus with his erect penis.  In the video, the adult male handcuffs the boy's arms and ankles, turns him on his stomach, and inserts a plug into the boy's anus.  Thereafter, the adult male penetrates the boy's anus again with his penis while the boy remains handcuffed on his wrists and ankles.

Records from the BTC Exchange 1 revealed that the Subject BTC Account 1 (which sent BTC to The Website) was created on or about October 3, 2016 with the following know-your-customer data:

- a phone number of 951-472-XXXX; and
- an email address of jackmioff692565@gmail.com

As part of the BTC Exchange 1's legally required customer due diligence rules, BTC

Exchange 1 confirmed this email address and phone number by sending messages to which the user had to reply. The defendant had funded Subject BTC Account 1 by using prepaid credit cards, which typically do not require a proof of identification to purchase and can be funded by cash in over the counter transactions. Notably, sophisticated users who are seeking to conceal their activities and identity use prepaid cards, which are more difficult, if not impossible, to trace.

Subpoena returns from Google for jackmioff692565@gmail.com provided the name "Jon D" with a recovery email address of wunderlichcharles@yahoo.com (i.e., Charles Wunderlich). Subpoena returns from Yahoo for wunderlichcharles@yahoo.com lists Charles Wunderlich ("defendant") as the user and the recovery email address as jackmioff692565@gmail.com. The Yahoo account also listed a phone number of 760-XXX-5874.

Besides the four transfers to The Website, the only other transaction by Subject BTC Account 1 was a transfer on or about December 30, 2017 for approximately 0.00522238 BTC ($55.77) to BTC address 1H8Y, which was located at a separate United States virtual-currency exchange ("BTC Exchange 2"). Subpoena returns from BTC Exchange 2 revealed the owner of BTC address 1H8Y was "Charles Douglas Wunderlich" ("Subject BTC Account 2"). Additionally, BTC Exchange 2 revealed that Subject BTC Account 2 was created on or about November 30, 2017 with the following know-your-customer data:

- an email address of jackmioff692565@gmail.com, which is the same email address associated with Subject BTC Account 1;
- user name of "jack mioff;"
- a photograph of a California driver's license numbered D6514780 in the name of Charles Douglas Wunderlich;
- a selfie-styled photograph of an individual resembling the photograph identified on Wunderlich's driver's license;
- a date of birth of January X, 1985, which is the same date of birth identified on the driver's license for Wunderlich[1];
- an address of XXXXX Tamar Drive, Desert Hot Springs, California, which is the same address identified on the driver's license for Wunderlich; and

---

[1] Records from BTC Exchange 2 had a second separate date of birth field in its records, which listed the date as "12/X/1985." This appears to be a typographical error, as the correct date is "1/X/1985."

- a phone number ending in 5874, which is the same phone number associated with Wunderlich's Yahoo account.

## POST-ARREST INVESTIGATION

The defendant was incarcerated in California since November 2018 on an unrelated offense. On October 16, 2019, he was released into the custody of Homeland Security Investigations agents on the government's criminal complaint and arrest warrant in this case. At that time, the defendant acknowledged that he had used an "app" called "Mega," which is a file-sharing application, where the defendant admitted to receiving depictions of child pornography from other file-sharing users. Law enforcement also executed a search warrant on the defendant's email address, jackmioff692565@gmail.com, which was the email address used to open both Subject BTC Account 1 (which paid into The Website) and Subject BTC Account 2 (which was opened with the defendant's personal identifying information). Pertinent evidence from the search warrant returns include the following:

- There are many selfie-styled photographs and other user attribution evidence that identifies the defendant as the account holder.

- Contained within the email returns is at least one video depicting child pornography located in his Google drive folder "2016-09-07." This video depicted pre-pubescent children performing various sexual acts on adult males and themselves.

- Contained within the email returns includes several photographs of drugs and related drug paraphernalia. The defendant also attempted to purchase red phosphorus, which is a known meth precursor.

- The defendant received an email from "MegaUpload" about his account containing "…sexual conduct with or by children…" Note that during his interview with law enforcement, the defendant admitted to receiving child pornography from the "mega" file-sharing application.

- On December 22, 2017, the defendant sent an email to an unknown individual asking, "Have you hot any boys vides good one like not the same old shit."

- The defendant's Google account returns also identified searches for The Website.

## CONCLUSION

Numerous co-conspirators, to include the defendant, conspired with the administrator of The Website, co-conspirator Jong Woo Son, to upload child pornography videos files to The Website for dissemination to The Website's vast customers. The co-conspirators entered into this agreement to benefit:

a.  co-conspirator Jong Woo Son, who obtained illicit income as co-conspirators uploaded more video files to The Website, which other customers then paid to access; and

b.  the defendant, who derived points from uploading videos and further points from the uploads when users of The Website downloaded his videos, and these points could then be redeemed to download new video files from The Website.

Here, the defendant knowingly distributed 13 videos of child pornography.  These visual depictions of child pornography were shipped and transported in interstate and foreign commerce and using a means and facility of interstate and foreign commerce, including by computer, and/or were produced using materials that had been shipped and transported in and affecting interstate and foreign commerce, including by computer.  The production of these visual depictions involved the use of one or more minors engaging in sexually explicit conduct.  The visual depictions of child pornography were of one or more children under the age of eighteen (18) years engaging in such sexually explicit conduct.  Specifically:

- One or more images and videos of child pornography possessed by the defendant involved a "prepubescent minor…who had not attained 12 years of age."  See U.S.S.G. 2G2.2(b)(2).

- The videos the defendant uploaded to The Website were distributed for the "receipt of a thing of value, but not for pecuniary gain," see U.S.S.G. 2G2.2(b)(3)(B), to wit: the

defendant received points that he could only redeem on The Website for downloading additional videos depicting child pornography;

- At least one of the videos contained depictions of sadistic or masochistic conduct, to wit: a prepubescent child penetrated by an adult penis, see U.S.S.G. 2G2.2(b)(4);

- In total, the defendant distributed 13 videos that depicted child pornography and downloaded four videos that depicted child pornography.  Accordingly, the offense involved "600 or more images." See U.S.S.G. 2G2.2(b)(7)(D); see also Application Note 4(B)(ii) ("each video…shall be considered to have 75 images.")

## II.   SENTENCING CALCULATION

### A.   Statutory Penalties

The offense of Conspiracy to Distribute Child Pornography carries a maximum sentence of 20 years of imprisonment and a term of imprisonment not less than 5 years pursuant to 18 U.S.C. § 2252A(b)(1), a fine of not more than $250,000 or twice the pecuniary gain or loss pursuant to 18 U.S.C. § 3571(d), an order of restitution, and an obligation to pay any applicable interest or penalties on fines or restitution not timely made, a period of supervised release – after any period of incarceration – of not less than five years or life pursuant to 18 U.S.C. § 3583(k), and a special $100 assessment and $5,000 assessment pursuant to 18 U.S.C. § 3014(a) for any non-indigent person convicted of offenses under enumerated chapters of the Code, including the offense of Distribution of Child Pornography.

### B.   Guidelines Range

The government agrees with the calculation of the defendant's Guidelines sentencing range contained in the final pre-sentence report ("PSR").  The base offense level is 22, pursuant to U.S.S.G. § 2G2.2(a)(2).  The government agrees with the PSR that several specific offense

characteristics apply:  the material involved prepubescent minors or minors under the age of 12 (+2); the defendant knowingly engaged in distribution for something of value (+5); the conduct involved sadistic and/or masochistic conduct (+4), the offense involved the use of a computer (+2); and the offense involved more than 600 images (+5).  There are no additional adjustments that apply.  Accordingly, the defendant's adjusted offense level is 40.

The defendant is entitled to a two-level reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a).  The government hereby moves to decrease the defendant's offense level by an additional level pursuant to § 3E1.1(b) because he timely notified the authorities of his intention to enter a guilty plea and thus permitted the government and the Court to preserve resources.  As a result, the defendant's total offense level is 37.

The government agrees with the PSR that the defendant is in Criminal History Category VI based on his criminal history calculations.  With an offense level of 37 and a Criminal History Category VI, the defendant's Guidelines sentencing range is 360 months to life.  However, the statutorily authorized maximum sentence of 20 years (240 months) is less than the minimum of the applicable guideline range; therefore, the guideline term of imprisonment is 240 months.  See USSG §5G1.1(a).  Sixty months is mandatory term of imprisonment.

## III.   GOVERNMENT'S RECOMMENDATION

### A.   Application of the Federal Sentencing Guidelines

In United States v. Booker, 125 S. Ct. 738 (2005), the Supreme Court held that the mandatory application of the United States Sentencing Guidelines violates the Sixth Amendment principles articulated in Blakely v. Washington, 124 S. Ct. 2531 (2004).  As a consequence, the Court invalidated the statutory provision that made the Guidelines mandatory, 18 U.S.C. § 3553(b)(1).  Booker, 125 S. Ct. at 756.

In post-Booker cases, the Supreme Court has stated that a district court should begin all

sentencing proceedings by correctly calculating the applicable Guidelines range. See United States v. Gall, 552 U.S. 38, 49 (2007) ("As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."). After giving both parties an opportunity to argue for an appropriate sentence, the district court should then consider all of the applicable factors set forth in 18 U.S.C. § 3553(a). Id. These factors include "the nature and circumstances of the offense and the history and characteristics of the defendant" (18 U.S.C. § 3553(a)(1)); the need for the sentence imposed to reflect the seriousness of the offense, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed correctional treatment (18 U.S.C. § 3553(a)(2)); the kinds of sentences available (18 U.S.C. § 3553(a)(3)); the Sentencing Guidelines and related Sentencing Commission policy statements (18 U.S.C. § 3553(a)(4) and (a)(5)); the need to avoid unwarranted sentencing disparities (18 U.S.C. § 3553(a)(6)); and the need to provide restitution to any victims of the offense (18 U.S.C. § 3553(a)(7)).

### B.    Basis for the Government's Recommendation

The government submits that a sentence of 120 months (10 years) is appropriate and warranted in this case and specifically recommends a period of supervised release of 15 years based on the factors in 18 U.S.C. § 3553(a). The recommended sentence is sufficient, but not greater than necessary, to accomplish the purposes of sentencing.

### 1.    Nature and Circumstances of the Offense

The defendant specifically sought out and actively participated in an online safe haven that fostered the mutual encouragement and promotion of the sexual exploitation of children. In addition, the defendant laundered funds in a sophisticated manner to support a prolific child pornography website.

Notably, the United States Sentencing Commission conducted a hearing on the child pornography sentencing guidelines on February 15, 2012.   Department of Justice (DOJ) employees James Fottrell and Steve DeBrota, and former DOJ employee Francey Hakes provided the following testimony regarding how technological advances were exacerbating the threats posed by child pornography offenses:

> In the last ten years, we have seen a sharp increase in the severity and depravity of child pornography offenses, fueled in large part by *swiftly advancing technological changes* which permit offenders to easily store large numbers of images of child sexual abuse, to create safe havens online where they can communicate and bond with other individuals who encourage and promote the sexual exploitation of children, and to utilize sophisticated methods to evade detection by law enforcement.  This increase is reflected in the changes in the content of the images over time, as infants and toddlers are now regularly victimized by child pornography offenders and the victims are forced into more brutal and degrading sexual activity.

> Additionally, *the technological changes that continue to make it easier for offenders to commit these crimes* are reflected in the number of defendants prosecuted in federal court for child pornography offenses, which has increased every year for over ten years.

> We are also seeing the crime change with respect to the *technical complexity and sophistication of the offenders who exploit the developments in both software and hardware*.  Storage capacity on hard drives and external media has exploded at the same time that prices for such equipment have dropped, making it feasible for individuals cheaply to store millions of image and video files. Internet speeds have skyrocketed, allowing users to download a video in a matter of seconds that, just a few years ago, would have taken hours. At the same time, smart phones and the development of faster wireless networks have turned phones into a viable and portable alternative method to distribute and collect child pornography. *New platforms are being constantly developed to allow individuals to chat, network, and share files. Child pornography offenders are early adopters of these platforms, co-opting them to further their criminal purpose and to create virtual communities that exist outside the bounds of normal society and that embrace and promote the sexual exploitation of children*. Finally, offenders are *exploiting the development of new technologies*, such as evidence eliminating software, encryption, and methods to conceal their Internet activities, *to evade detection by law enforcement*. The result of these changes is clear: we are seeing more and more offenders, engaged in more sophisticated criminal conduct, exploiting a larger number of children in a more depraved way.

<u>See</u>        https://www.ussc.gov/sites/default/files/pdf/amendment-process/public-hearings-and-

meetings/20120215/Testimony_15_Hakes_DeBrota_Fottrell.pdf (emphasis added).

Moreover, on November 13, 2013, Acting Assistant Attorney General Mythili Raman testified before the Senate Committee on Homeland Security and Governmental Affairs provided the following testimony regarding the unique threat posed by cryptocurrency, including as to child pornography offenses:

> As virtual currency has grown, it has attracted illicit users along with legitimate ones. Our experience has shown that some criminals have exploited virtual currency systems because of the ability of those systems to conduct transfers quickly, securely, and often with a perceived higher level of anonymity than that afforded by traditional financial services. The irreversibility of many virtual currency transactions additionally appeals to a variety of individuals seeking to engage in illicit activity, as does their ability to send funds cross-border.
>
> Cyber criminals were among the first illicit groups to take widespread advantage of virtual currency. We have seen that many players in the cyber underground rely on virtual currency to conduct financial transactions. *Early users of virtual currency also included criminals involved in the trafficking of child pornography*, credit card fraud, identity theft, and high-yield investment schemes. As virtual currency became more widespread and criminals became increasingly computer savvy, other criminal groups moved to capitalize on virtual currency, as well. There are now public examples of virtual currency being used by nearly every type of criminal imaginable.
>
> It is not surprising that criminals are drawn to services that allow users to conduct financial transactions while remaining largely anonymous. And, indeed, *some of the criminal activity occurs through online black markets, many of which operate as Tor hidden services.* Tor hidden services are sites accessible only through Tor, an anonymizing network that masks users' Internet traffic by routing it through a series of volunteer servers, called "nodes," across the globe. *Online black markets capitalize on Tor's anonymizing features to offer a wide selection of illicit goods and services, ranging from pornographic images of children* to dangerous narcotics to stolen credit card information.

See https://www.justice.gov/opa/speech/acting-assistant-attorney-general-mythili-raman-testifies-senate-committee-homeland (emphasis added).

Consistent with the Justice Department testimony noted above, the defendant's use of cryptocurrency and technologically-advanced online black markets made tracking his activities exponentially more difficult to discover by law enforcement and demonstrates the growing threat

posed by such technology in the child exploitation realm.  Of specific concern to the government, the defendant not only downloaded these graphic and disturbing videos, but he contributed to the growing marketplace by also uploading 13 videos that depicted the sexual abuse of children.

It goes without saying that child pornography causes real and lasting harm in our society. It is not just about images and videos; it is about real children who are at best being treated as sexualized objects and at worst being horrifically and repeatedly sexually abused.  Individuals— like the defendant—who promote child pornography offenses are part of the illicit market for child pornography, which continually re-victimizes the children in already-existing images and videos. As the Supreme Court recognized in the seminal case of New York v. Ferber:

> The use of children as subjects of pornographic materials is very harmful to both the children and the society as a whole.  It has been found that sexually exploited children are unable to develop healthy relationships in later life, have sexual dysfunctions, and have a tendency to become sexual abusers as adults.

> Pornography poses an even greater threat to the child victim than does sexual abuse or prostitution.  Because the child's actions are reduced to a recording, the pornography may haunt him in future years, long after the original misdeed took place.

458 U.S. 747, 758-60 nn. 9 & 10 (1982).  The Court continued, "[a] child who has posed for a camera must go through life knowing that the recording is circulating within the mass distribution system for child pornography . . . .  It is the fear of exposure and the tension of keeping the act secret that seem to have the most profound emotion repercussions." Id. at 759 n.10.  Victims must cope, every day, with wondering whether someone they have come in contact with has seen the pictures or videos of their abuse.

One of the defendant's victims, and the parents of that victim, submitted Victim Impact Statements to the Court.  Their submissions made clear: these innocent children, and by extension their families, must cope, every day, with wondering whether someone they have come into contact

with has seen the pictures or videos of their abuse.  They are revictimized – continuously exploited – by each consumer and distributor of child pornography.  As the victim, "Lily," specifically noted in her Victim Impact Statement:

> I live everyday with the horrible knowledge that many people somewhere are watching the most terrifying moments of my life and taking grotesque pleasure in them.  I am a victim of the worst kind of exploitation: child porn.  Unlike other forms of exploitation, this one is never ending.  Everyday, people are trading and sharing videos of me as a little girl being raped in the most sadistic ways.  They don't know me, but they have seen every part of me.  They are being entertained by my shame and pain.  ("Vicky" series).

Accordingly, the defendant's sentence here must reflect the seriousness of the offense and its long-lasting effects on his victims.

### 2.      History and Characteristics of the Defendant

While the nature of the conduct is abhorrent, the government has also considered the defendant's history and characteristics when weighing an appropriate sentence.  Unlike other defendants that this Court has sentenced in connection with Welcome to Video, the defendant has a lengthy criminal history.  His criminal history is replete with theft and drug-related offenses. However, all of these convictions resulted in sentences of incarceration that were ultimately no greater than 24 months.

Notably, one factor that gave the government considered when weighing whether the 240-month guideline sentence was appropriate was the defendant's documented mental health issues.

[redacted text]

[redacted text]

Taking his mental health diagnosis into account, the government does not believe that the maximum sentence statutorily applicable is an appropriate sentence – especially when considering that Courts often vary down from the guideline range for reasons associated with a defendant's mental health complications.  Without question, the defendant's criminal history score is high, but his criminality stems and spirals from his mental health and correlated drug dependency. Accordingly, in consideration of the defendant's mental health complications, the government believes that a 10-year sentence (120 months) with a lengthy period of supervised release (15 years) is appropriate.  The 10-year term of incarceration coupled with necessary treatment programs and strict supervision conditions will hopefully accomplish the dual goals of sentencing: retribution for the defendant's victims but a chance to address the defendant's underlying criminal behaviors.

3.      **Punishment, Deterrence, Protection, and Correction**

A sentencing court "shall impose a sentenced sufficient, but not greater than necessary" to comply with the need for a sentence: "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (d) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."  18 U.S.C. § 3553(a)(2).

The government's recommended sentence is sufficient, but not greater than necessary, to provide just punishment for the defendant's offenses.  The defendant's distribution of child pornography videos and the resulting promotion of a child exploitation scheme certainly harmed

society at large, but also specifically, the child victims involved, and thus warrants a significant sentence of imprisonment greater than the mandatory minimum sentence. His conduct also warrants a lengthy period of supervised release with specific conditions that will address his mental health and drug dependency issues.

### 4.   Available Sentences And Supervised Release Conditions

The defendant should be sentenced to a term of incarceration. The defendant is in Zone D of the Guidelines, and thus a probationary sentence would be a departure from the Guidelines.

In addition, the Court should impose a term of supervised release, and the government recommends a term of 15 years. Supervised release is critical because it will subject the defendant to ongoing monitoring and ensure compliance with conditions that are meant to support the defendant. The conditions of supervised release should include the following conditions, which are conditions imposed in similar child exploitation cases and conditions:

(1)   The defendant must submit to searches of his person, property, house, residence, vehicle, papers, computers, other electronic communications or data storage devices or media, and effects, at any time, with or without a warrant, by law enforcement or probation officer with reasonable suspicion concerning unlawful conduct or a violation of a condition of supervision.

(2)  The defendant must undergo and comply with sex offender evaluation and treatment. This may include the use of polygraph testing as part of the therapeutic process. While the government notes that the defendant's mental health providers indicated in their reports that sex offender evaluation and treatment may not be appropriate in this case, the government would defer to the sex offender providers to make that specific determination. Here, the defendant was both consumer and distributor of child pornography, and he also sought out additional depictions of child pornography based

on his email history.  Accordingly, his interest in child pornography does not appear to have been fleeting.  It is the government's position that the defendant's drug dependency, mental health, and sexual interest in children are distinct issues that the defendant needs to recognize and address equally with targeted treatment programs.

(3)    The defendant must continue to undergo mental health and drug dependency treatment with appropriate programs as recommended by the U.S. Probation Department.  The defendant will comply with his medication regime and be drug tested on a schedule that is recommended by the U.S. Probation Department.

(4)    The defendant's use of the Internet, computers, and any other Internet-capable devices will be restricted and monitored.

(5)    The defendant will not have direct contact with minors without the written approval of probation.  This also entails both an employment/volunteer restriction and residential restriction, in that the defendant shall not be employed in any capacity, or participate in any volunteer activity, which may cause him to come in direct and/or unsupervised contact with children for more than momentary duration without advanced approval by the United States Probation Office, and the defendant shall have all residences pre-approved by the United States Probation Office. Specifically, the defendant shall not live in a residence where minor children also reside without the permission of the United States Probation Office.

(6) The defendant will be considered a Tier II sex offender for purposes of the Sex Offender Registration and Notification Act "SORNA" and will be required to register as a sex offender for 25 years.  The defendant will also be subject to local and state registration requirements.

As it relates to the above conditions, first, the defendant will be required by statute to

register as a sex offender as a result of his conviction in this case.  Second, the defendant's crimes stem from his online communications.  Thus, the defendant's use of the Internet to commit his crimes justifies monitoring his future use.  Third, the defendant's collection and distribution of child pornography material justifies monitoring his direct contact with any minors and supports the imposition of sex offender evaluation and continued sex offender treatment.  Fourth, the defendant's mental health and drug dependency issues warrant continued treatment upon his release with frequent drug testing and a specific order that the defendant comply with taking his medication(s) as prescribed.

### 5.        Avoiding Unwarranted Sentencing Disparity

One of the statutory factors to consider at sentencing is the need to avoid unwarranted disparity.  Indeed, avoiding such uncertainty and disparity was one of the purposes for the creation of the Sentencing Guidelines, and is one of the reasons for the government's recommendation of a 120-month sentence in lieu of the 240-month guideline sentence.

Discussed below is a compilation of those individuals who were identified as uploaders to the Website,[2] and who have pled guilty and been sentenced around the country:[3]

(1) <u>Defendant Ernest Wagner, District of Columbia</u>:  The defendant uploaded 84 videos and downloaded 40 videos depicting child pornography from The Website.  A subsequent forensic review of his electronic devices identified 92 images and 22 videos depicting child pornography.  The defendant agreed to plead guilty to one count of Conspiracy to Distribute Child Pornography, in violation of 18 U.S.C. Sections 2252(a)(2) and (b)(1).  His guideline range was 210-262 months of incarceration.  He had no prior criminal convictions.  Due to both his mental health issues and physical condition, the Court sentenced the defendant to the mandatory minimum sentence of 60 months incarceration.

---

[2]        Several of the defendants listed in the PSR were not uploaders to the site and are thus not comparable defendants.

[3]        The government would note that there are limited uploaders who have been identified by law enforcement. Uploaders who have been identified by law enforcement are those individuals who both uploaded content to the site and who also paid Bitcoin into the site.  It was through their Bitcoin transactions, which included identifying personal information, that law enforcement was able to identify these uploading offenders.  Thus, an uploader who <u>only</u> uploaded content and who never engaged in Bitcoin transactions with The Website remains anonymous to law enforcement.

(2) <u>Defendant Michael Ezeagbor, District of Columbia (Rule 20: Western District of Texas)</u>: The defendant uploaded 10 videos and downloaded 42 videos depicting child pornography from The Website.  A subsequent forensic review of his electronic devices identified 190 images and 14 videos depicting child pornography.  Due to the defendant's extreme mental health diagnosis and his young age at the time of his offense, the government agreed to a plea to one count of Possession of Child Pornography, in violation of 18 U.S.C. Section 2252(a)(4).  The defendant's guideline range was 87-108 months of incarceration.  He had no prior criminal convictions.  The government requested the low-end of the guidelines.  The Court sentenced the defendant to time served, which was approximately 6 days incarceration.

(3) <u>Casey Santious Head, Northern District of Georgia</u>:  The defendant uploaded 24 videos to The Website.  He also downloaded 120 videos from The Website.  The defendant pled guilty to Distribution of Child Pornography, in violation of 18 U.S.C. Sections 2252(a)(2) and (6).  His guideline range was 210-262 months.  The government recommended the mandatory minimum sentence of 60 months incarceration.  The Court subsequently sentenced the defendant to 60 months incarceration.

(4) <u>Defendant Anthony Bellisario, Western District of Pennsylvania</u>:  The defendant uploaded six videos to The Website.  The defendant pled guilty to Receipt of Material Depicting the Sexual Exploitation of a Minor ("Receipt"), in violation of 18 U.S.C. Section 2252(a)(2), and Possession of Material Depicting the Sexual Exploitation of a Minor, in violation of 18 U.S.C. Section 2252(a)(4)(B).  His total offense level was 37 with a criminal history category of I.  The resulting guideline range was 210-262 months with 60 months mandatory for Receipt.  The Court sentenced the defendant to 90 months incarceration.

(5) <u>Michael Don Gibbs, District of Utah:</u> The defendant uploaded six videos to The Website. He pled guilty to Possession of Material Depicting the Sexual Exploitation of a Minor, in violation of 18 U.S.C. Section 2252(a)(4)(B). The conduct for the plea was based on evidence identified in a subsequent search warrant.  Due to mitigating factors identified in the defendant's psychosexual evaluation, the parties agreed to a sentencing range between 36-84 months incarceration.  The Court sentenced the defendant to 48 months incarceration.

(6) <u>Charlie Caso, Central District of California</u>:  The defendant uploaded one video to The Website.  The defendant pled guilty to one count of Possession of Material Depicting the Sexual Exploitation of a Minor, in violation of 18 U.S.C. Section 2252(a)(4)(B).  The conduct for the plea was based on evidence identified in a subsequent search warrant. His guideline range was between 87-108 months.  The parties agreed to 42 months incarceration and the Court sentenced him accordingly.

(7) <u>Dakotah Hiatt, Wilmington, North Carolina:</u>  The defendant uploaded one video to The Website.  His prosecution is being handled by the State of North Carolina and he was charged with state related child exploitation crimes.  Undersigned has no further information on this case.

(8) <u>Ammar Alahdali, Eastern District of Virginia</u>:  The defendant uploaded one video to The Website but law enforcement was unable to recover the video on the server to confirm whether it was of child pornography.  He was charged with Receipt of Child Pornography, in violation of 18 U.S.C. Section 2252(a)(2), for the child pornography he downloaded from The Website.  He pled guilty to the lead charge with a calculated guideline range of 97 to 121 months incarceration.  The Court sentenced him to the mandatory minimum sentence of 60 months incarceration.

(9) <u>Nader Ahmed, District of New Jersey</u>**:**  The defendant uploaded two videos to The Website depicting child pornography.  He pled guilty to one count of Distribution of Child Pornography, in violation of 18 U.S.C. Section 2252(a)(2).  Probation calculated the total offense level at 32, resulting in a calculated guideline range of 121 months to 151 months.  However, the Government's plea agreement did not include two enhancements that probation had calculated, specifically (i) possessing materials involving a prepubescent minor or minor under the age of twelve (U.S.S.G. Section 2G2.2(b)(2)), and (ii) the use of a computer (U.S.S.G. Section 2G2.2(b)(6)).  The Government's calculated total offense level was 28 with a resulting calculated guideline range of 78 months to 97 months incarceration.  The Court sentenced the defendant to 78 months incarceration.

Based on the compilation of sentencing information, it becomes clear that sentencing among uploaders has varied throughout the country.  Some prosecutors extended Possession of Child Pornography pleas for evidence seized during subsequent search warrants in lieu of charges stemming from their conduct on the website itself.  Other prosecutors extended Distribution of Child Pornography pleas, even where just two videos were uploaded (i.e. Ahmed).  In several cases, there were mitigating factors that warranted a downward variance, for example in Wagner (mental health/physical condition), Ezeagbor (mental health/age), and Gibbs (mitigation factors identified in psychosexual evaluation).  In almost all of the cases, the Court sentenced the offenders to below the applicable guideline ranges and sentences ranged from six days (Ezeagbor) to 90 months (Bellisario).  Notably, in the three cases where the defendant was sentenced for the offense of Distribution of Child Pornography, twice the defendant received the mandatory minimum sentence of 60 months and the third was sentenced to 78 months.

While these sentences are less than the government's recommendation of 120 months, the government would note that the majority of these offenders have little, to no, criminal history.

Accordingly, the government believes that this defendant does warrant a sentence that considers the differences between his history of crime and the lack thereof in others.  However, the government also believes that a 240-month guideline sentence would be both too draconian based on the defendant's mental health complications and too disparate when considering other uploader's sentences throughout the country.  When striking a necessary balance between his criminal history and the need to avoid disparate sentences, the government believes that a 120-month sentence accomplishes that objective.

The government is also including, for purposes of comprehensiveness, other offenders that this Court has sentenced stemming from this operation.  These offenders were <u>downloaders</u> from the website only, and thus the government was not inclined to compare their sentences to this defendant but still wanted to include them for defense and the Court to consider otherwise:

(1) <u>Brian LaPrath, District of Columbia</u>:  LaPrath pled guilty to Laundering of Monetary Instruments, in violation of 18 U.S.C. Section 1956(a)(2)(A) and was sentenced to 18 months incarceration.  Evidentiary issues in LaPrath's case warranted the government's plea offer to solely Laundering of Monetary Instruments.  He had no criminal history.

(2) <u>Nicholas Stengel, District of Columbia:</u> Stengel, who had a prior conviction for Possession of Child Pornography, pled guilty to Receipt of Child Pornography, in violation of 18 U.S.C. Section 2252(a)(2), and Laundering of Monetary Instruments, in violation of 18 U.S.C. Section 1956(a)(2)(A).  Stengel had amassed an extensive collection of child pornography from The Website: over 6,000 videos and 600,000 images depicting child pornography.  With a total offense level of 34 and a Criminal History Category of II, Stengel's sentencing range of imprisonment was 168 to 210 months of incarceration.  The Court sentenced him to the mandatory minimum sentence of 15-years incarceration (180 months) with lifetime supervision.

(3) <u>Jason DeJournett, District of Columbia</u>: DeJournett pled guilty to Access with Intent to View Child Pornography, in violation of 18 U.S.C. Section 2252(a)(4)(B).  DeJournett downloaded 113 videos depicting child pornography from The Website.  DeJournett's estimated guideline range was 151-188 months incarceration.  The Court sentenced him to 33 months incarceration and a $80,000 fine.  He had no criminal history.

(4) <u>Darryl Miller, District of Columbia (Rule 20: District of Kansas)</u>:  Miller, who was initially charged in the District of Columbia with one count of Access with Intent to

View Child Pornography, was transferred to the District of Kansas for imposition of his plea and sentence.  Miller downloaded approximately 20 gigabytes of data from The Website and had approximately 57 child pornography images on his devices. The defendant's guideline range was between 78 months and 97 months.  The Court in Kansas sentenced the defendant to 60 months incarceration.  According to the Assistant U.S. Attorney who handled Miller's sentencing, the Court's sentence of 60 months was an 18-month downward variance that was based, in part, on Miller's prior combat military experience.

6. _Restitution and Victim Impact Statements for the Victims_

The government has been in communication with the victims' lawyers and defense counsel. At the time of this filing, the victim identified in the "Vicky" series (known as "Lily") has requested restitution.   It is the government's understanding that the parties are in the process of negotiating a restitution amount.   This amount will be subsequently included in any Judgement and Commitment Order by the Court at the time of sentencing.  The government acknowledges and is appreciative of the defendant's willingness to cooperate with his restitution obligations without the need for protracted litigation in Court.

The government previously filed with the Court, and provided to defense counsel, copies of the Victim Impact Statements from the victim known as "Lily" and her parents.

## IV.    <u>CONCLUSION</u>

WHEREFORE, based on the facts of this case, the information contained in the Presentence Investigation Report, and the foregoing, the government recommends that the Court sentence the defendant to a term of imprisonment of 120 months (10 years), to be followed by 15 years of supervised release, with the standard and recommended conditions of supervision.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
District of Columbia

/s/ *Lindsay Jill Suttenberg*

By:   _____

LINDSAY JILL SUTTENBERG
Assistant United States Attorney